# UNITED STATES DISTRICT COURT

for the

District of Columbia

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>TWO APPLE IPHONES SEIZED IN LOS ANGELES,<br>CURRENTLY LOCATED AT 555 4TH STREET, NW,<br>WASHINGTON, DC, UNDER RULE 41</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.  19-sw-00222</td></tr>
</table>

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(3)(B) and (h); 22 U.S.C. § 2778; 22 C.F.R. Parts 120-130; 31 U.S.C. § 5324(a)(3) and (d)(2) | Money Laundering; Arms Export Control Act; International Traffic in Arms Regulations; and Bank Secrecy Act |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared D. Clelan, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____06/10/2019_____

_____
*Judge's signature*

City and state: __Washington, D.C.__

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   19-sw-00222 |
| TWO APPLE IPHONES SEIZED IN LOS ANGELES, | ) | |
| CURRENTLY LOCATED AT 555 4TH STREET, NW, | ) | |
| WASHINGTON, DC, UNDER RULE 41 | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____June 24, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____U.S. Magistrate Judge Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____06/10/2019_____         _____
                                                                                  *Judge's signature*

City and state:     _____Washington, D.C._____         _____Robin M. Meriweather, U.S. Magistrate Judge_____
                                                                                  *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    19-sw-00222 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to be searched*

The property to be searched is are an Apple iPhone [unknown serial number] using telephone number 310-259-2020, recovered from UMRARONG's desk, at his office located at 8330 Hindry Avenue S.W., Los Angeles, CA, on May 15, 2019; and another Apple iPhone [unknown serial number] using telephone number 310-704-1168, recovered from DOMSA in Los Angeles, CA, on May 15, 2019., hereinafter the "Devices."  The Devices are currently located at 555 4th Street, N.W., Washington, D.C.  20530.

## ATTACHMENT B

*Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of the Arms Export Control Act; the International Tracking in Arms Regulations; and the federal money laundering statute, as described in the search warrant affidavit, including, but not limited to the following records in the cell phones found on site:

    a.   Electronic records of books, records, receipts, bank statements, passbooks, safe deposit keys and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

    b.   Electronic records of tickets, notes, schedules, receipts and other items relating to foreign and domestic travel;

    c.   Electronic address and/or telephone books reflecting names, addresses and/or telephone number and other contact information of coconspirators, associates, customers and sources of financial supply;

    d.   Photographs of coconspirators, associates, assets, and financial-related proceeds.

    e.   Photographs of identity documents, including passports, alien resident cards, and any related immigration documents or paperwork;

    f.   Photographs of United States currency or other items of value, such as jewelry and automobile titles;

g.  Records and photographs of firearm parts destined for export to Thailand or other countries in violation of the Arms Export Control Act and/or the International Trafficking in Arms Regulations;

h.  Records and information pertaining to the illegal shipment and/or exportation of goods from the United States;

i.  Records and information that constitute evidence of the means through which the illegal goods described above were obtained;

j.  Records and information that constitute evidence of the state of mind of Siriporn Domsa and Adison Umrarong, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

k.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with Siriporn Domsa and Adison Umrarong about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

l.  evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

m.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

n.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

o.  evidence of the times the Devices were used;

p.  passwords, encryption keys, and other access devices that may be necessary to access the Devices;

q.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Devices;

r.  records of or information about Internet Protocol addresses used by the Devices; and

s.  records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF TWO APPLE IPHONES SEIZED IN LOS ANGELES, CURRENTLY LOCATED AT 555 4TH STREET, NW, WASHINGTON, DC, UNDER RULE 41** | **SW No.  19-sw-00222** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jared Clelan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two digital devices—which are currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Special Agent with Homeland Security Investigations ("HSI") within Immigration and Customs Enforcement ("ICE") and have been employed by HSI since July 2001 (between July 2001 to March 2003, ICE was known as the U.S. Customs Service).  Prior to joining the federal government in 2001, I was a law enforcement officer with the South Carolina Department of Probation, Parole, and Pardon Services in Columbia, South Carolina.  During the course of my employment with HSI, I have been involved in many types of investigations including, but not limited to, the illegal exportation of firearms and/or firearm parts and money laundering.  During the course of these investigations, I have interviewed informants and cooperating witnesses, conducted physical surveillance, supervised undercover operations and

consensual recording by cooperating individuals, analyzed pen register information, and participated in the preparation and execution of numerous search and arrest warrants. I am currently assigned to the HSI High Intensity Drug Trafficking Area ("HIDTA") Drug Money Laundering Initiative ("DMLI"); however, I was recently working in the HSI Baltimore Counter-Proliferation Task Force where I was responsible for enforcing federal criminal statutes, including violations of Title 18 and Title 22 of the United States Code.

3.      Through my training and experience, as well as through consultation with other law enforcement agents, I have become familiar with a variety of means through which individuals and entities import and export merchandise in violation of federal laws. I am generally aware of the methods used in the illegal exportation of U.S. goods, and also the financial transactions supporting those illegal activities, including a variety of means through which individuals and entities export "defense articles" in violation of those laws. I am familiar with illegal export schemes, which involve the trans-shipment of commodities through third parties to restricted end-users. I am also familiar with different methods of money laundering, including the structuring of cash transactions to avoid the Currency Transaction Reports ("CTRs") which are required to be filed for cash transactions exceeding $10,000 by, through, or to a financial institution. In addition, I am familiar with U.S. financial systems and the modus operandi of individuals involved in money laundering activity. In addition, I have become knowledgeable regarding the methods and means used by unlicensed money remitters in placing deposits into the financial system, as well as layering funds through accounts and integrating funds back into the commerce of the United States or abroad through wire transfers.

4.      I also have received training in and have participated in complex money laundering operations involving the placement and movement of illegal proceeds.  In my training and experience, I know that money laundering operations are designed to promote underlying unlawful activity and/or to integrate illegally earned proceeds into the financial and commercial systems in a manner that avoids detection.  Money laundering operations often smuggle or transfer funds to a location outside the United States.  The money laundering methods are designed to allow those who engage in illegal activity the ability to reap the economic benefit from the accumulated illegal proceeds.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 1956(a)(3)(B) and (h) [Money Laundering]; 22 U.S.C. § 2778 [Arms Export Control Act]; 22 C.F.R. Parts 120-130 [International Traffic in Arms Regulations]; and 31 U.S.C. § 5324(a)(3) and (d)(2) [Bank Secrecy Act] have been committed by Siriporn Domsa ("DOMSA" or "EDD")[1] and Adison Umrarong ("UMRARONG").[2] There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.      The property to be searched  are an Apple iPhone [unknown serial number] using telephone number 310-259-2020, recovered from UMRARONG's desk, at his office located at

---

[1] Law enforcement's investigation has revealed that EDD is DOMSA's nickname.

[2] DOMSA and UMRARONG were arrested on May 15, 2019, and are being prosecuted in this jurisdiction in the case of *U.S. v. Synergy Link, et al.*, Cr. No. 19-149 (APM).

8330 Hindry Avenue S.W., Los Angeles, CA, on May 15, 2019; and another Apple iPhone [unknown serial number] using telephone number 310-704-1168, recovered from DOMSA in Los Angeles, CA, on May 15, 2019. The two iPhones will be referred to as the Devices, unless otherwise indicated.

7.     The Devices are currently located at 555 4th Street, N.W., Washington, D.C.

## STATUTORY AUTHORITY

8.     As set forth below, I believe that there is probable cause to believe that the Devices contain evidence related to structuring activity intended to evade the reporting requirements of the Bank Secrecy Act.   As described in detail below, there is probable cause to believe that UMRARONG and DOMSA have exported and attempted to export firearms parts from the United States to Thailand, without the required federal license, and engaged in money laundering and structured financial transactions, in violation of federal laws.

### The Bank Secrecy Act and Evasion of Filing Requirements

9.     Title 31, United States Code, Section 5313, and Title 31, Code of Federal Regulations, Section 1010.300 *et seq.*, require any financial institution that engages with a customer in a currency transaction (*i.e.*, a deposit or withdrawal) in excess of $10,000.00 to report that transaction to the Financial Crimes Enforcement Network (FinCEN) on FinCEN Form 104, which is known as a CTR.   These regulations require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are conducted by, or on behalf of, the same person, and they result in either currency received or disbursed by the financial institution totaling more than $10,000.00 during any one-business day.   See 31 C.F.R. § 1010.313(b). A transaction or series of transactions does not have to exceed $10,000 at "any

4

single financial institution on any single day in order to constitute structuring." 31 C.F.R. § 1010.100(xx). Structuring is prohibited by Title 31, United States Code, Section 5324(a).

10.     Structuring offenses can involve either structured deposits ("structuring in") or structured withdrawals ("structuring out"). The government does not need to prove that the structured currency is derived from unlawful activity. See United States v. MacPherson, 424 F.3d 183, 193 (2d Cir. 2005) (noting that Section 5324 makes no reference to the source of the monies at issue, or to reasons why a person may seek to avoid a CTR filing; rather the singular focus of the section is the method employed to evade the filing requirement, i.e. structuring); see also United States v. Cisneros, 26 F. Supp. 2d. 24, 50 (D.D.C. 1998). I am aware that, to prove the crime of structuring transactions to evade reporting requirements, the government need not prove that an individual engaging in structuring knows that his structuring activity is illegal. See United States v. Van Allen, 524 F.3d 814, 820 (7th Cir. 2008); see also United States v. Wynn, 61 F.3d 921, 927 (D.C. Cir. 1995) (holding that defendant's purchase of multiple cashier's checks in amounts less than $10,000 to conduct transactions in larger amounts "created an inference that he was motivated to avoid the reporting requirement."). Instead, the government must establish only that an individual structured, or attempted to structure, a transaction with a domestic financial institution for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), or any regulation prescribed under that section. It is irrelevant that an individual did not personally conduct each structuring transactions as Title 31, Code of Federal Regulations, Section 1010.100(xx) provides that structuring occurs when a person acts in conjunction with, or on behalf of, other persons for the purpose of evading the reporting requirements.

11.    A transaction or series of transactions does not have to exceed $10,000 at "any single financial institution on any single day in order to constitute structuring." 31 C.F.R. § 1010.100(xx).  Therefore, the United States may charge a defendant with structuring by alleging the occurrence of a series of currency transactions under $10,000 in order to evade the reporting requirement.[3]  See United States v. Cisneros, 169F.3d 763, 771 (D.C. Cir. 1999) (noting that impermissible structuring occurs even if the transactions are conducted over the course of several days); see also United States v. Sperrazza, 804 F.3d 1113, 1124–25 (11th Cir. 2015) (Section 5324 does not require the United States to show "the defendant had in hand at one time $10,000 or more of the funds he allegedly structured.").

12.    "[R]epeated transactions [at or] below $10,000 are evidence of intent to structure in violation of § 5324."  United States v. Malewicka, 664 F.3d 1099, 1110 (7th Cir. 2011); see also Van Allen, 524 F.3d at 820-21 (noting that the sheer volume of transactions under $10,000 can fairly lead a jury to conclude the transactions were conducted with the intent of evading the reporting requirements).  "[A] pattern of structured transactions . . . may, by itself, permit a rational jury to infer that a defendant had knowledge of and the intent to evade currency reporting requirements."  MacPherson, 424 F.3d at 195.

13.    Furthermore, based on my training and experience, I know that many individuals often routinely deposit cash that they need to operate their trade, business, or personal ventures. However, such deposits do not routinely or repeatedly consist of round numbers that approach, but never exceed, $10,000.00.  I am further aware that when individuals make multiple cash deposits

---

[3] In this search warrant, law enforcement based structuring determinations on whether the deposits occurred over a forty-hour period that aggregated to over $10,000.

that are close to, but do not exceed $10,000.00, they are often trying to avoid triggering the filing of a CTR.  In sum, such conduct indicates structuring to evade reporting requirements.

Relevant Money Laundering Provisions

14.     Title 18, United States Code, Section 1956(h) criminalizes a conspiracy to violate Section 1956.

15.     Title 18, United States Code, Section 1956(a)(3) (the sting money laundering statute) criminalizes involvement in a financial transaction when the involved property is represented to be proceeds of, or is facilitating, a specified unlawful activity when those involve intend to promote a specified unlawful activity; conceal or disguise of the nature, location, source, ownership, or control of assets believed to be the proceeds of unlawful activity; or avoid a transaction reporting requirement under State or Federal law.

16.     Pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(v), the term "specified unlawful activity," includes smuggling or export control violations, pursuant to the Arms Export Control Act, described below.

The Arms Export Control Act

17.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President of the United States to control the export of "defense articles" by designating items on the United States Munitions List ("Munitions List"), which is codified at 22 C.F.R. Part 121.

18.     The AECA and its attendant regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, required a person to apply for and obtain an export license from the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), located in the District of Columbia, before exporting from the United States arms,

7

ammunition, or articles of war, which were all categorized as defense articles under 22 U.S.C. §§ 2778(b)(2), and 22 C.F.R. Parts 120.1 and 121.1.  In the application for an export license, the exporter was required to state, among other things, the nature of the defense articles to be exported, the end recipient of the defense articles, and the purpose for which the defense articles were intended.

19.     The ITAR defines a defense article to be any item on the United States Munitions List ("USML"), which is contained in the regulations.  22 C.F.R. §§ 120.2, 121.1.  The USML sets forth twenty-one categories of defense articles that are subject to export licensing controls by the DDTC, ranging from firearms parts to military equipment to missiles.  22 C.F.R. § 121.1. The defense articles, which were subject to such licensing requirements, were designated on the Munitions List.  Those designations were made by the State Department with the concurrence of the Defense Department under 22 U.S.C. § 2778(a)(1) and 22 C.F.R. Part 120.2. Category I of the Munitions List included firearms, as well as firearms components, parts, and accessories. Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or written approval from the DDTC is unlawful.

**PROBABLE CAUSE**

20.     As part of a related HSI investigation, law enforcement learned that firearm parts have been shipped by or via Synergy Link Corporation ("SYNERGY"), a freight forwarder operating in Los Angeles, to addresses in Thailand.  SYNERGY is owned and operated by DOMSA and UMRARONG.  During its investigation, HSI introduced a Confidential Informant (hereinafter, "CI-1") to DOMSA and UMRARONG as a purported exporter of firearms parts to be sold in Thailand.  CI-1 has also been presented to DOMSA and UMRARONG as needing

assistance with transporting and laundering the proceeds of those illicit firearm sales between the United States and Thailand.   CI-1's information has proven reliable in this investigation. Moreover, throughout this investigation, CI-1 has been in frequent contact with DOMSA and UMRARONG via text messaging and phone calls.  The Devices use the same telephone numbers that were used to communicate with DOMSA and UMRARONG via text messages and phone calls during the course of the investigation, and thus there is probable cause to believe the Devices bear evidence of those communications.

<u>Money Laundering Conspiracy</u>

21.     From in or about July 2015 to on or about May 15, 2019, CI-1 worked with UMRARONG and DOMSA to transfer funds purported to be proceeds of illegal firearms sales in Thailand, from the United States to a place outside the United States—namely, Thailand and Australia, as well as purported proceeds from Thailand to the United States.   The bulk of communication and coordination for the conspiracy occurred through text messages, recorded phone calls, and in-person meetings at the SYNERGY business location.  These conversations are described in detail below.  For example, UMRARONG advised CI-1, via text message, to structure the proceeds into accounts associated with UMRARONG, as well as periodically updated CI-1 on the progress of the laundered funds.  Specifically, UMRARONG repeatedly told CI-1 to break the funds down into deposits of amounts under $10,000.00 to avoid having to show identification at the time of deposit.  Based on my training and experience, the directive to break up a deposit into separate deposits amounting to under $10,000 is consistent with structuring transactions with the intent of preventing banks from filing a CTR with the Financial Crimes Enforcement Network ("FinCEN").

22. For example, on September 2, 2015, CI-1 received the following text message from UMRARONG: "Wells Fargo Acct: Synergy Link Corp #6834400795" ("0795 Account"). CI-1 then provided UMRARONG with a foreign account number to which the funds should be sent. On September 3, 2015, CI-1 received the following text message from UMRARONG's cellphone: "$12000 - $150 wire/service fee $11850 correct?" CI-1 responded, "That ok." UMRARONG then replied, "ok will send out today." Subpoena returns revealed that the account number provided by UMRARONG was held in SYNERGY's name. A forensic analysis of the account revealed a wire transfer from SYNERGY's 0795 Account in the amount of $11,850 on September 4, 2015 to the foreign account CI-1 provided to UMRARONG, confirming that UMRARONG sent the purported proceeds of illicit firearms sales to a foreign bank account at CI-1's direction.

23. On June 22, 2016, CI-1 met with UMRARONG at the SYNERGY business location to discuss the movement of an additional $50,000 to Australia. During the meeting, CI-1 represented that s/he had acquired the money from shipping firearms and/or firearm parts to Thailand without receiving the necessary licenses. UMRARONG advised that he needed to speak with DOMSA before agreeing to send the money. On June 23, 2016, law enforcement, acting as CI-1, contacted UMRARONG via text message and advised that the $50,000 should be sent to a bank account maintained by a bank in Australia.

24. On June 28, 2016, UMRARONG explained that the purported proceeds of illegal firearm sales ($50,000) should be deposited into one of SYNERGY's Accounts at J.P. Morgan Chase Bank ("JPMC") ("2015 Account") account as follows: "Pls deposit: $5850, $8300, $3575, $7450, $6825, $4740, $8260, $8120, $1880." Law enforcement subsequently texted UMRARONG on CI-1's behalf, and informed UMRARONG that the SYNERGY account

provided could not be utilized because there were no local JPMC branches in the Washington, D.C. area.  Law enforcement, again acting as CI-1, asked UMRARONG for another bank account into which CI-1 could deposit the aforementioned proceeds.

25.     On that same date, June 28, 2016, CI-1 spoke with DOMSA during a recorded conversation concerning the movement of funds. DOMSA used a cell phone that bore the same telephone number as the Device that was recovered from her on May 15, 2019. During the recorded conversation, DOMSA warned CI-1:

> "It needs to be more careful this time . . . because of all the issues about too many banks had been shut down lately. Too much lost within many angles. So I advised to Adison [UMRARONG] to send it per partial not all at once trip. Because we don't want to get caught and thinking it's money laundering."

26.     During this same telephone conversation, CI-1 proposed depositing $8,000 or $9,000 each time.  DOMSA replied, "Well then! That's okay to do it this way and then send him text so he can see the amount of receipts. Because each and every day, we had money transferred in from around the world  . . . ." DOMSA then discussed that the fee they would charge for transferring the funds would be 10% and stated that this was the agreement for all of her "customers" and that the fee had been decided with her "partner."  CI-1 negotiated the fee and DOMSA ultimately agreed to charge 8%.

27.     On June 29, 2016, UMRARONG responded by text message from his Device that CI-1 should deposit the $50,000 into an account described as "[customer's name withheld] Wells Fargo 5945918463" ("8463 Account") as follows: "Pls deposit: $5850, $8300, $3575, $7450, $6825, $4740, $8260, $8120, $1880." Subpoena returns revealed that this account was held in the name of the bank customer named in UMRARONG's text message.

11

28.     CI-1 responded to UMRARONG with the following text message: "this total wrong. Edd [referring to DOMSA] said 8% commission so you only take $4000. i will put in $5850, $3300, $3575, $7450, $6825, $4740, $8260, $8120, $1880. you send $46000 2 Austral." Your affiant understands this conversation to mean that the dollar amounts provided by UMRARONG to CI-1 did not accurately account for the 8% commission CI-1 and DOMSA had agreed upon, and that out of the $50,000 deposited, $46,000 should be laundered.

29.     On June 29, 2016, law enforcement travelled to Washington D.C. to deposit $50,000 into the bank account provided by UMRARONG via text message.  Agents deposited the funds according to the structuring method outlined by UMRARONG's text messages at nine different Wells Fargo branches in the Washington, D.C. area.  Soon thereafter, law enforcement, acting as CI-1, exchanged several text messages with UMRARONG, asking if the funds had been sent to Australia.  UMRARONG advised that he was "arranging to withdrawal and transfer" the funds.

30.     After not receiving confirmation from UMRARONG and being unable to contact him, CI-1 texted DOMSA to determine when the funds would be transferred.  A few days later, DOMSA replied by text that UMRARONG would return soon and transfer the funds. UMRARONG subsequently texted CI-1 that the funds would be sent to the Australian account through two wires, one for $21,575 and one for $24,425.  Law enforcement received notification on July 7, 2016, that a transfer had been made to the Australian account they had provided to UMRARONG.  Law enforcement was able to trace the deposited funds from the Australian bank account to the 2015 Account, despite the fact that the funds had been deposited into the  8463 Account.

31.     On August 31, 2016, CI-1 met with UMRARONG.   During the meeting, CI-1 discussed moving money to Australia and Thailand using in-person cash transfers instead of wiring funds between bank accounts.   During the meeting, CI-1 told UMRARONG that CI-1's primary income comes from shipping gun parts to Thailand without a license and that they primarily ship rifle parts, such as barrels, scopes, and receivers.   UMRARONG indicated to CI-1 that he understood the origin of the CI-1's funds.

32.     On November 1, 2016, UMRARONG sent CI-1 several text messages, in which UMRARONG advised that CI-1 should deposit money into the following bank accounts: "[bank customer's name withheld] Wells Fargo 5945918463, [bank customer's name withheld] Wells Fargo 7806285461, [bank customer's name withheld]Wells Fargo 5001767002" ("7002 Account") as follows: "not more than $5000 per deposit," with a "10% fee" and "pls do not deposit total in one day."   Additionally, UMRARONG advised that CI-1 should "let [UMRARONG] know after each deposit."   Per UMRARONG's instructions, your affiant and other federal agents structured $144,855 into the aforementioned accounts over a two-day period.   Those funds were subsequently wired to an Australian bank account law enforcement had provided to UMRARONG through CI-1.   Accordingly, law enforcement was able to determine that the funds originated from SYNERGY's 2015 Account.

33.     During the course of these transactions, CI-1 maintained frequent contact with DOMSA and UMRARONG via phone calls and text messages and contacted them using these means several times.   The phone numbers CI-1 and law enforcement used to contact DOMSA and UMRARONG match those of the Devices.

34.     I submit that the facts herein establish probable cause to believe that DOMSA and UMRARONG have engaged in various money laundering and structuring transactions.  Moreover, I submit that the above facts demonstrate that DOMSA and UMRARONG used the Devices to communicate with CI-1, and that there is thus probable cause to believe that their phones, i.e. the Devices, contain further evidence of money laundering, conspiracy to launder money, and violations of various provisions of the Bank Secrecy Act.

### *Weapons Smuggling Conspiracy*

35.     On September 10, 2015, CI-1 met with UMRARONG and DOMSA at the PREMISES to discuss sending export-controlled firearm parts to Thailand.  CI-1 told UMRAONG and DOMSA that s/he was unable to obtain the appropriate license to export the parts.  DOMSA advised CI-1 that SYNERGY could ship the gun parts and that the gun parts could be ordered and shipped directly from United States gun companies to the PREMISES.

36.     On December 5, 2015, U.S. Customs and Border Protection ("CBP") examined a shipment for export to Thailand that listed its contents as "Household Goods."  The U.S. Principal Party in interest for the shipment was listed as "SYNERGY LINK CORP" with an address of 1135 Terminal Way in Reno, Nevada.  This is the same address SYNERGY listed in its certificate of incorporation.  The shipment contained three firearm slides, twenty pounds of gunpowder, twelve riflescopes, one 9x19 threaded gun barrel, three .22LR conversion kits, eighteen one-pound bottles of gunpowder, and twelve red dot riflescopes.  The barrel and conversion kit required a license from the U.S. State Department Directorate of Defense Trade Controls prior to export, and the riflescopes required a license from the U.S. Department of Commerce prior to export.  CBP seized

these items because their attempted export was in violation of the Arms Export Control Act (22 U.S.C. § 2778) and the International Trafficking in Arms Regulations (22 C.F.R §§ 120 *et seq.*).

37.     On March 24, 2016, HSI agents stationed in Bangkok, Thailand assisted Royal Thai Customs with the seizure of a shipment of firearm parts.  The shipment originated in Los Angeles, California and listed SYNERGY as the U.S. Principal Party.  The export paperwork for the shipment listed the contents as "Household Goods," but in fact contained firearm parts concealed within.

38.     CI-1 met with UMRARONG throughout early 2019 to arrange for a similar method of export.  CI-1 asked UMRARONG, via text message, to permit him to use SYNERGY's business address as a delivery point for firearms parts, and to assist him with packaging the firearms parts for export to Thailand.  After UMRARONG agreed to assist with the receiving and packaging of the firearms parts, UMRARONG sent a text message to CI-1 with Synergy's business address. Law enforcement then purchased firearms parts from a retail company that sells firearms parts ("Company 1") and they were shipped to Synergy's business address.

39.     Once UMRARONG received the firearms parts, he messaged CI-1 several cell phone pictures of the firearm parts to confirm their receipt.  UMRARONG also sent CI-1 pictures of automobile parts he would ultimately use in an attempt to obscure the nature of the firearm parts.  At that time, law enforcement provided CI-1 with $5,000 (the prior agreed-upon price for receiving and packaging the firearms parts), which CI-1 paid to UMRARONG at a subsequent meeting.   During the meeting, UMRARONG provided CI-1 with the packaging slip from Company 1, listing each of the firearms parts UMRARONG packaged for CI-1.

40.     The Devices are currently in the lawful possession of HSI and stored at 555 4th Street, NW, Washington, DC.  The Devices came into HSI's possession in the following way: UMRARONG's phone was recovered from his desk, at his office located at 8330 Hindry Avenue S.W., Los Angeles, CA, on May 15, 2019, during the execution of a search warrant at that address. DOMSA's phone was recovered from her home when she was placed under arrest in Los Angeles, CA, on May 15, 2019.

## **TECHNICAL TERMS**

41.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global

positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.      "Passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      d.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      e.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

h.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example

usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

42.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://apple.com**,** I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## CELLPHONES AND FORENSIC ANALYSIS

43.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons:

a.    Individuals who engage in criminal activity, including the illegal export of firearms and the laundering of money, commit those offenses using various means, including using wireless telephones, like the Devices, to access websites to facilitate illegal activity and to communicate

with co-conspirators online; to store on digital devices, like the Devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a cell phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore,

deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space—for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

44.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the Devices were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of

how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed

dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  Although it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

45.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.       Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.       Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.       Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner

24

of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the

printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party

applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

46.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.      The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

47.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that

good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

48.     I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Jared Clelan
Special Agent
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn to before me on June 10, 2019

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE